Jennifer L. **WAHL**, Plaintiff,

v.

**NORTHERN TELECOM INC.,**
Defendant.

Civ. A. No. 89–C–299.

United States District Court,
E.D. Wisconsin.

Dec. 1, 1989.

As Amended Dec. 4, 1989.

---

Joseph J. Welcenbach, Welcenbach & Widmann, Milwaukee, Wis., for plaintiff.

Terry E. Nilles and Catherine Mode, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for defendant.

## AMENDED DECISION AND ORDER

REYNOLDS, Senior District Judge.

### FACTS

On June 29, 1986, the plaintiff Jennifer L. Wahl ("Jennifer") a resident of Wisconsin, was involved in an automobile accident which caused her physical injury. The automobile was driven by Theresa Grosskopf. Theresa's parents, Kenneth and Shirley Grosskopf, were insured by State Farm Mutual Insurance Company ("State Farm"). Jennifer was a minor at the time of the accident, and her mother, Nancy Wahl ("Ms. Wahl"), petitioned the Waukesha County Circuit Court of Wisconsin to appoint a guardian ad litem to oversee any claims Jennifer had against the Grosskopfs. The court granted Ms. Wahl's petition on May 16, 1988, and appointed attorney Richard Double as Jennifer's guardian ad litem.

Jennifer's father is Wayne Paul Wahl ("Mr. Wahl"), an employee of defendant, Northern Telecom Inc. ("Northern"), a Delaware corporation with headquarters in Tennessee. On July 31, 1978, an amended decree of dissolution of Mr. and Mrs. Wahl's marriage was entered by the Bonneville, Idaho County Court. As part of the dissolution decree, the Idaho state court ordered Mr. Wahl to pay "any reasonable medical and optical expenses in-

curred for the care and treatment of the minor children of the parties."

Mr. Wahl included Jennifer as a dependent beneficiary under Northern's Group Benefits Plan for Employees ("the Plan"). The Plan is a self-insured employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. (1988). The Plan paid in excess of $42,000 in medical expenses incurred by Jennifer as a result of the injuries suffered in the accident. In addition, the Grosskopfs' insurance company, State Farm, agreed to pay Jennifer the maximum amount of coverage under the Grosskopfs' insurance plan, $100,000, in full settlement of all her claims against the Grosskopfs and State Farm.

On February 7, 1989, Jennifer's guardian ad litem commenced an action against Northern in the Circuit Court for Waukesha County, Wisconsin. Although entitled a "third party complaint," Jennifer was seeking a declaratory judgment that Northern had no subrogation rights under the terms of the Plan to money she would receive in a settlement with State Farm. State Farm was not a party to this action. On March 10, 1989, Northern filed a petition for removal to this court and a counterclaim against Jennifer seeking a declaratory judgment that the terms of the Plan entitled it to share in any settlement Jennifer enters into with a third party. Removal was proper pursuant to Title 28 U.S.C. §§ 1441 and 1332 because the amount in controversy exceeds $10,000 and there is diversity of citizenship between Northern and Jennifer.

On July 13, 1989, Northern moved this court for summary judgment. Northern claims that there are no material facts in dispute and that the Plan's terms require Jennifer to reimburse it for payments it has made on her behalf if she receives payments related to her injuries from a responsible third party (e.g., the Grosskopfs and State Farm). Northern argues that the terms of the Plan are dispositive of its subrogation rights to any settlement Jennifer receives because the Wisconsin common law on subrogation is preempted by ERISA.

On October 24, 1989, this court held an oral argument on Northern's motion for summary judgment and granted Jennifer's permission to file a cross-motion for summary judgment. This court also requested both parties to supplement the record by filing affidavits supporting their arguments for summary judgment. On October 27, 1989, Jennifer filed a cross-motion for summary judgment with supporting affidavits, and on November 1, 1989, Northern supplemented its summary judgment motion with a supporting affidavit.

Jennifer does not dispute Northern's claim that there are no disputed material facts, but instead claims that the terms of the Plan are ambiguous and that she therefore is not required to reimburse the Plan until she is fully compensated for the injuries she has suffered. She also argues that she is not liable to the Plan because (1) the Wisconsin common law pertaining to subrogation should apply and (2) she never agreed to repay the plan for benefits received if she obtained a settlement from a third party.

As there are no material facts in dispute, summary judgment is proper pursuant to Fed.R.Civ.P. 56(c). After reviewing the briefs, exhibits, and affidavits submitted by the parties, this court finds (1) that the Wisconsin common law pertaining to subrogation rights is preempted by ERISA, (2) that federal common law determines the limitations on the subrogation rights a self-insured employee benefit plan has against a participant or beneficiary, and (3) that Northern does not have a contractual right to subrogation of payments Jennifer may receive. Thus, this court denies Northern's motion for summary judgment and grants Jennifer's cross-motion for summary judgment.

## DISCUSSION

### I. FEDERAL PREEMPTION

The first question this court must answer is whether or not the Wisconsin common law on subrogation is preempted by

ERISA. The Wisconsin Supreme Court has stated:

It appears clear that, under Wisconsin law as recapitulated in *Garrity*, one who claims subrogation rights, whether under the aegis of either legal or conventional subrogation, is barred from any recovery unless the insured is made whole.

*Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis.2d 263, 272, 316 N.W.2d 348, 353 (1982) (referring to *Garrity v. Rural Mutual Insurance Company*, 77 Wis.2d 537, 253 N.W.2d 512 (1977)). Thus, if the Wisconsin common law ("the *Rimes* doctrine") is applicable to the dispute between Northern and Jennifer, the Plan is barred from recovering any money from Jennifer until she has been made whole.

Northern does not dispute that the *Rimes* doctrine prohibits it from recovering from Jennifer until she is made whole, but instead, argues that this state law is automatically preempted by 29 U.S.C. § 1144(b)(2)(B), otherwise known as the "deemer clause," (*see Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987)) because the Plan is self-insured. Jennifer has not objected to Northern's assertion that ERISA governs the Plan nor that the Plan is self-insured. Upon review of Title 29 U.S.C. §§ 1002(1), 1003, and 1132, and the terms of the Plan, this court finds (1) that Jennifer's claim for clarification of her rights under the Plan is governed by ERISA and (2) that the Plan is self-insured.

There are three provisions in ERISA which determine when state law is preempted: (1) the general "preemption clause" in 29 U.S.C. § 1144(a); (2) the "savings clause" in 29 U.S.C. § 1144(b)(2)(A); and (3) the "deemer clause" in 29 U.S.C. § 1144(b)(2)(B). The United States Supreme Court has repeatedly held that the first two provisions operate to preempt a state law that in any way "relates to" employee benefit plans unless the state law "regulates insurance." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987); *Met-*

*ropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 733, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1984); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). In addition, even if the state law "regulates insurance," it is still preempted if it falls within the "deemer clause." *Pilot*, 481 U.S. at 45, 107 S.Ct. at 1552.

**A. The "Preemption Clause"**

In *Pilot*, the Supreme Court reiterated the expansive common-sense meaning it had given to the phrase "relate to" in *Metropolitan v. Massachusetts* and *Shaw*. The court held that a state law "relates to" an employee benefit plan and is therefore preempted under the "preemption clause" if it has any connection or reference to the plan. *Pilot*, 481 U.S. at 47–48, 107 S.Ct. at 1553. The *Rimes* doctrine is connected to the Plan because it directly affects the relationship between the insurer and insured. Thus, the Wisconsin law is preempted unless it "regulates insurance" pursuant to 29 U.S.C. § 1144(b)(2)(A).

**B. The "Savings Clause"**

■ The Supreme Court in *Pilot* considered three factors in determining whether or not a state law claim was saved from preemption because the state law regulated insurance within the meaning of 29 U.S.C. § 1144(b)(2)(A): (1) the common-sense meaning of the term "regulates insurance," (2) the criteria that are used to determine if a practice is considered the "business of insurance" under the McCarran–Ferguson Act, and (3) the Congressional intent that ERISA's civil enforcement scheme be exclusive. 481 U.S. at 57, 107 S.Ct. at 1558. Only the first two factors are relevant in this case because the *Rimes* doctrine does not involve the civil enforcement scheme of ERISA. After considering the two pertinent factors, this court finds that the *Rimes* doctrine "regulates insurance" within the meaning of 29 U.S.C. § 1144(b)(2)(A).

First, the Court in *Pilot* wrote that, "[a] common-sense view of the word 'regulates' would lead to the conclusion that in order

to regulate insurance a law must not just have an impact on the insurance industry, but must be specifically directed toward the industry." 481 U.S. at 50, 107 S.Ct. at 1554. The subrogation rule of *Rimes* was directed at the insurance industry, and the common law roots of the rule are firmly imbedded in insurance case law. *See generally Rimes* 106 Wis.2d 263, 316 N.W.2d 348; *Garrity,* 77 Wis.2d 537, 253 N.W.2d 512.

Second, the Supreme Court considers three criteria when determining if a state common law is part of the "business of insurance" under the McCarran–Ferguson Act:

> "*[F]irst,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry."

*Pilot,* 481 U.S. at 48–49, 107 S.Ct. at 1553–54 (quoting *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982)) (emphasis in original). The *Rimes* doctrine definitely transfers the policyholder's risk as noted by the Wisconsin Supreme Court:

> "[W]here either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume."

*Rimes,* 106 Wis.2d at 276, 316 N.W.2d 348 (quoting *Garrity,* 77 Wis.2d at 542, 253 N.W.2d 512). In addition, the *Rimes* doctrine is an integral part of the policy relationship between an insurer and insured because it limits the breadth of the insurer's subrogation rights. Finally, there is no definitive answer as to whether or not the *Rimes* doctrine is limited to entities in the insurance industry. Although *Rimes* dealt only with the relationship between an insurer and insured, this court can imagine situations where the *Rimes* doctrine arguably could be applied to the relationship between a surety and a creditor. The *Rimes* doctrine's primary aim and effect,

however, is directed at the insurance industry. Thus, this court finds that the *Rimes* doctrine "regulates insurance" within the meaning of 29 U.S.C. § 1144(b)(2)(A).

## C. The "Deemer Clause"

█ The federal courts are split as to the meaning and breadth of the deemer clause. The Seventh, Eighth and Ninth Circuits have held that the deemer clause creates a bright-line distinction between insured and self-insured plans where insured plans are subject to state laws that "regulate insurance," and self-insured plans are not. Essentially, if the employee benefit plan is self-insured, then *all* state laws that "relate to" the plan are automatically preempted. *Reilly v. Blue Cross & Blue Shield United of Wis.* 846 F.2d 416, 425 (7th Cir.1988); *Baxter v. Lynn,* 886 F.2d 182, 185 (8th Cir.1989); *United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga,* 801 F.2d 1157, 1161 (9th Cir.1986).

These three circuit courts base their interpretation of the deemer clause on the following language used by the Supreme Court in *Metropolitan v. Massachusetts:*

> We are aware that our decision results in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not. By so doing we merely give life to a distinction created by Congress in the "deemer clause," a distinction Congress is aware of and one it has chosen not to alter.

471 U.S. at 747, 105 S.Ct. at 2393. The Supreme Court in *Metropolitan,* however, was considering the effect of the savings and deemer clauses on an *insured* employee benefit plan.

The Third and Sixth Circuits argue that because the Court did not directly consider the effect of the deemer clause on a self-insured plan, the court's language is only dicta, and being a self-insured plan does not automatically preempt all state laws that relate to employee benefit plans. *FMC Corp. v. Holliday,* 885 F.2d 79, 89 (3rd Cir.); *Northern Group Services v. Auto Owners Ins. Co.,* 833 F.2d 85, 91 (6th Cir.1987).

The Third Circuit argues that the legislative history of the deemer clause indicates that Congress intended for this clause to preempt only state laws that concern core matters of ERISA (participation, funding, vesting, reporting, disclosure, and fiduciary regulations; *see Shaw*, 463 U.S. at 91, 103 S.Ct. at 2896). *See* 885 F.2d at 86–90. The Third Circuit claims that the legislative history indicates:

> that Congress intended the deemer clause to protect core ERISA concerns within the context of the insurance regulation exception to preemption.... the deemer clause guards against any insurance regulation that infringes on such ERISA areas as reporting, disclosure, and nonforfeitability.

*FMC Corp.*, 885 F.2d at 88.

Thus, the Third Circuit concludes that, "the proper inquiry under the deemer clause is whether the state insurance regulation intentionally or unintentionally addresses a core type of ERISA matter which Congress sought to protect by the preemption provision." *Id.* at 90.

The Sixth Circuit took a slightly different approach to limiting the breadth of the deemer clause. The Sixth Circuit concluded that the legislative history behind the deemer clause was ambiguous and held that:

In the absence of a showing of state purpose specifically to regulate the content of welfare benefits provided by ERISA, the effect of the deemer clause should be assessed by a balancing of the interests in federal uniformity against those of state primacy in the regulation of insurance.

*Northern Group Services*, 833 F.2d at 93 (conclusion made at 92). Essentially, the Sixth Circuit held that the deemer clause permitted balancing the federal interest of uniformity against a state's interest in maintaining its substantive regulatory laws of insurance. If there is no definitive interest in national uniformity and there is a state interest in maintaining its regulation, then the state regulation is not preempted by the deemer clause. *See Id.* at 92–95.

The Third and Sixth Circuits both reconciled their interpretations of the deemer clause with the Supreme Court's statement in *Metropolitan* by concluding that insured plans are per se subject to state laws regulating insurance, while self-insured plans have to be considered on a case-by-case basis. *FMC Corp.*, 885 F.2d at 90; *Northern Group Services*, 833 F.2d at 94–95.

Although this court will follow the Seventh Circuit's holding in *Reilly* regarding the breadth of the deemer clause, it agrees with the Third and Sixth Circuits' interpretation of the deemer clause.[1] Finding that

---

1. This court has reached this conclusion for two reasons: (1) the Third and Sixth Circuits inquiry into the legislative history of the deemer clause appears to be far more in depth and accurate than the inquiry made by either the Supreme Court or the Seventh, Eighth, or Ninth Circuits; and (2) although there is a rational basis for distinguishing between insured and self-insured plans for preemption of state laws dealing with ERISA core matters, there appears to be no such basis for this distinction for non-core matters, such as an insurer's subrogation rights.

An insured plan interacts significantly with a state insurance industry while a self-insured plan does not, and therefore the insured plan should be subject to all state laws that regulate insurance. This reasoning, however, does not lead to the conclusion that self-insured plans should be exempt from all state laws that regulate insurance. As the Supreme Court has repeatedly noted, one of Congress' primary purposes in creating ERISA was to:

"protect ... participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal Courts."

*Pilot* 481 U.S. at 44, 107 S.Ct. at 1551; *quoting* § 2, as set forth in 29 U.S.C. § 1001(b); *see also Shaw*, 463 U.S. at 90, 103 S.Ct. at 2896. Preempting state laws that protect participants' and beneficiaries' rights (such as the *Rimes* doctrine) without providing any similar federal legislative protection directly undercuts this objective of ERISA. Thus, absent clear Congressional authorization to the contrary (either explicit or implicit), a self-insured plan should only be exempt from substantive state insurance regulations that have been replaced or are in conflict with specific federal regulations in ERISA (ERISA's core matters).

a self-insured plan is automatically exempt from state insurance regulations, however, does not dictate, as the defendant Northern claims, that the terms of an employee benefit plan are dispositive of the outcome. By preempting state law without providing any federal statute to replace it, Congress intended either (1) to eliminate all regulation of non-core ERISA matters for self-insured plans or (2) to replace the state regulations with federal common law.

## II. FEDERAL COMMON LAW

The federal courts must be cautious in finding that they have been granted Congressional authority to create substantive law. *Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 1444, 10 L.Ed.2d 605 (1963). Caution is required because a federal court simultaneously risks overstepping the grey boundaries of the separation of powers and of unnecessarily undercutting this country's federalist system of government whenever it establishes federal common law. The Supreme Court has noted the dangers involved in establishing federal common law and stated:

> There is of course, "no federal common law." Nevertheless, the court has recognized the need and authority in some limited areas to formulate what has come to be known as "federal common law." These instances are "few and restricted," and fall into essentially two categories: those in which a federal rule of decision is "necessary to protect uniquely federal interests," and those in which Congress has given the courts the power to develop substantive law.

*Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (citations omitted).

The Court has acknowledged that the legislative history of ERISA indicates that Congress expected "that a federal common law of rights and obligations under ERISA–regulated plans would develop ..." [2] *Pilot*, 481 U.S. at 56, 107 S.Ct. at 1557. In addition, Congress and the Supreme Court have repeatedly compared ERISA to the Labor Management Relations Act which vested, "in the courts the power to develop a common law of labor-management relations." *Texas Industries, Inc.*, 451 U.S. at 643, 101 S.Ct. at 2068, *citing Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Thus, this court finds that Congress intended for the federal courts to establish federal common law to determine the substantive limitations on self-insured plans.

There are numerous problems, however, with concluding that federal common law should fill the vacuum created by the preemption of state laws regulating insurance. If a court holds that federal common law dictates that the rights are determined solely by the employee benefit plan, then it essentially is holding that there is no federal regulation of this area of law.[3] This outcome, however, does not appear to be what Congress intended. Nowhere in the legislative history of ERISA does it appear that Congress wanted to reduce the substantive rights of participants and beneficiaries by allowing self-insured plans to be unregulated. In fact, as noted earlier, the Supreme Court has stated that "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw*, 463 U.S. at 90, 103 S.Ct. at 2896.

On the other hand, the only doctrinal guideline, besides Congressional intent, that appears to exist to help a federal court determine which substantive rights federal common law should create or deny appears to be a federal interest in uniformity. Thus, it appears that this court must deter-

---

**2.** Senator Javits stated:
> It is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.
120 Cong.Rec. 29,942.

**3.** This court believes it is imperative to understand that a holding that denies the creation of a federal common-law substantive right after a state law substantive right has been preempted is not neutral. This holding effectively establishes the federal common law that the substantive right in question does not exist.

mine what, if any, federal limitations should exist on a self-insured employee benefit plan's right to subrogation against an insured. This court, however, does not have to answer this difficult question because the terms of the Plan in question do not provide the Plan with subrogation rights against Jennifer.[4]

## III. THE RIGHTS OF THE PARTIES

■ Pursuant to the Idaho state court order, Mr. Wahl was obligated to pay for "any reasonable medical and optical expenses" incurred by Jennifer while she was a minor. Mr. Wahl was liable for these expenses regardless of whether or not he obtained insurance. Mr. Wahl, however, entered into a contract with Northern's employee benefit plan for the purpose of obtaining health insurance for himself and Jennifer.

Included in the Plan in effect at the time of Jennifer's injury (the 1986 Plan) was a section pertaining to the payment of Plan benefits when the injury to a person covered by the Plan was caused by a third party.[5] Essentially, the 1986 Plan stated that it would not pay any benefits to a covered person for injuries caused by a third party unless the covered person

agreed in writing to reimburse the Plan if money was received from or on behalf of the responsible third party.

There is, however, no evidence that indicates that Jennifer or Mr. Wahl, as her legal representative, agreed to reimburse Northern if Jennifer received payments for her injury caused by the Grosskopfs. The mere fact that the Plan's terms state that an agreement must be entered into prior to the Plan paying benefits does not by itself mean that the agreement exists.

The only written agreement regarding Northern's subrogation right to future payments occurred between Northern and Mr. Wahl on August 11, 1986. This agreement, however, was between Northern and Mr. Wahl, and Mr. Wahl only promised "to promptly repay the employee benefit plan if and when I receive payment(s) for the injury or sickness from or on behalf of the responsible person." (Pl. Sep. 20, 1989 Brief, Exh. D.) There is nothing in this agreement which states (1) that it was between Northern and Jennifer, or (2) that it was signed by Mr. Wahl on Jennifer's behalf (the line where the covered person was suppose to sign was blank), or (3) that Mr. Wahl promised to pay Northern if Jennifer

4. This court notes that if had to answer this question it would hold that federal common law should state that a self-insured plan can have no greater rights to subrogation against an insured than provided by state law. This outcome would be reached for two reasons. First, Congress' purpose in enacting ERISA was to protect the interests of participants and beneficiaries of both insured and self-insured benefit plans. Permitting self-insured plans to avoid regulation of non-core ERISA matters undercuts Congress' objective by leaving self-insured plan participants and beneficiaries unprotected in areas such as subrogation rights. Second, interests in federal uniformity dictate that within a given state, self-insured and insured plans should be subject to the identical regulations on subrogation rights. Federal uniformity can be accomplished by (1) eliminating all regulation of subrogation rights (essentially permitting an insurer to recover before an insured is made whole), or (2) establishing a federal rule that a self-insured plan cannot recover until the insured is made whole, or (3) allowing the state rule to govern. The first option is problematic because it is contrary to one of the purposes of ERISA and reduces the uniformity of the regulation of insured and self-insured plans. Similarly, the

second option also reduces the uniformity of regulation of insured and self-insured plans. The third option, however, uniformly regulates insured and self-insured plans, and therefore is the one this court would adopt.

5. During oral argument, Northern's counsel argued for the first time that the 1987 employee benefit plan did not require the covered person to agree in writing to pay back the Plan if payments were received from a responsible third party. Counsel claimed that the 1987 Plan gave Northern the right to subrogation of any payments a covered person received from a responsible third party regardless of whether or not an additional written agreement was entered into. In addition, in a written brief counsel argued that ERISA permitted an employer to change the terms of an employee benefit plan. This court notes, however, that although the terms of the Plan may be changed, equity considerations prohibit an employer from unilaterally amending a plan to eliminate coverage of a sickness or illness while a covered employee is in the middle of receiving payments for the illness. Thus, this court finds that the terms of the 1987 Plan are inapposite to the injury Jennifer incurred in the 1986 accident.

received future payments. In addition, the proposed settlement from State Farm will be Jennifer's, not Mr. Wahl's money.

Northern also has argued that Jennifer is bound by the terms of the Plan and the contract between Northern and Mr. Wahl because she is a third-party beneficiary of these agreements who takes the benefit of them subject to all of their terms and conditions (Def. Briefs July 13, 1989 at 8; Aug. 28, 1989 at 3; Oct. 3, 1989 at 4–6). The flaw with this argument, however, is that neither the terms of the Plan nor the terms of the August 11, 1986 agreement between Northern and Mr. Wahl grant Northern subrogation rights to money received by Jennifer. The Plan states:

> **Third Party Liability—** ... To the extent payment for the injury or illness is made, or may be made in the future, by or for that responsible third person ... charges arising from that injury or illness are not covered. But when claim is received by the Plan, benefits that would be payable except for the above exclusion will be paid if:
>
> .    .    .    .    .
>
> (2) the covered person involved (or if incapable, that person's legal representative) agrees in writing to pay back promptly the benefits paid as a result of the injury or illness to the extent of any future payments made by or for the responsible person for the injury or illness.

Nowhere in this language, however, does the participant or beneficiary of the Plan promise to repay the Plan if he or she receives money from a responsible third party. This language only states that the Plan is not required to make payments to a covered person until that person or her legal representative agrees in writing to repay the Plan if money is received from a responsible third party. Thus, even if this court were to find that Jennifer, as a third-party beneficiary, was bound by the terms of the Plan, these terms do not by themselves require her to pay Northern.

The terms of the written agreement entered into between Northern and Mr. Wahl also do not require Jennifer to pay Northern. As noted earlier, in this agreement Mr. Wahl promised to pay Northern if *he* received any payments. None of the terms of this agreement state that either Mr. Wahl or Jennifer will pay Northern if *Jennifer* receives payments. Moreover, the only signature on this agreement is Mr. Wahl's in the location where the "[e]mployee" is suppose to sign. There is no signature on the line where the person covered under the Plan is suppose to sign.[6] Thus, even if Jennifer were bound by the terms of both the Plan and this agreement, she still would not be contractually liable to repay Northern. Essentially, the only way to find that Northern has contractual subrogation rights to payments made to Jennifer is to *change* the terms of either the Plan or the agreement between Northern and Mr. Wahl.

IT IS THEREFORE ORDERED that Northern Telecom Inc.'s motion for summary judgment is denied.

IT IS FURTHER ORDERED Jennifer Wahl's cross-motion for summary judgment is granted and Northern Telecom Inc. and the Northern Telecom Inc. employee benefit plan have no contractual rights to subrogation of payments Jennifer Wahl receives from a third party for the injuries she suffered in the automobile accident of June 29, 1986.

---

**6.** During oral argument, Northern's counsel argued that public policy reasons dictate that a minor should be held liable for payments whenever his or her parent signs a subrogation agreement on their behalf. Counsel argued that requiring a guardian ad litem to sign the subrogation agreement on behalf of the minor would lead to lengthy delays in minors receiving benefits which would cause harm to the minors. This court fully agrees with this argument and believes that a parent's signature on a subrogation agreement as the legal representative of the minor does bind the minor to the agreement. This argument, however, is inapposite to the dispute between Jennifer and Northern because there is no evidence that Mr. Wahl signed the agreement on behalf of Jennifer.